UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY BRELAND,

        Plaintiff,

                                              Case No. 14-CV-10508

v.

                                              HON. MARK A. GOLDSMITH

LIBERTY LIFE ASSURANCE
COMPANY OF BOSTON,

        Defendant.

_____/

**OPINION AND ORDER**
**(1) GRANTING DEFENDANT'S MOTION FOR JUDGMENT AND SUMMARY**
**JUDGMENT ON DEFENDANT'S COUNTERCLAIM (Dkt. 16), AND (2) DENYING**
**PLAINTIFF'S MOTION FOR JUDGMENT (Dkt. 17)**

**I. INTRODUCTION**

This case is brought under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiff Jeffrey Breland brings this challenge under section 1132(a)(1)(B), challenging Defendant Liberty Life Assurance Company of Boston's ("Liberty Life") termination of Breland's disability benefits. Both parties moved for judgment, in accordance with the procedure outlined in Wilkins v. Baptist Healthcare Systems, Inc., 150 F.3d 609, 619 (6th Cir. 1998), for adjudicating an ERISA action. The cross-motions for judgment have been fully briefed, and a hearing was held on January 29, 2015. For the reasons set forth below, the Court grants Defendant's motion for judgment and summary judgment on its counterclaim, and denies Plaintiff's motion for judgment.

## II. BACKGROUND[1]

Breland was a sales specialist employed by Lowe's Companies, Inc. ("Lowe's").  Lowe's carried a group disability policy that provided both short-term and long-term disability insurance to its employees.  In February 2011, Breland sustained a back injury during a hunting trip.  Given his physical condition, Liberty Life approved Breland for short-term disability ("STD") benefits.

When Breland became eligible for long-term disability ("LTD") benefits in May 2011, Liberty Life initially denied Breland's claim.  After Breland pursued an administrative appeal of the denial, Liberty Life reversed its administrative determination and approved Breland's LTD claim in January 2012, to be applied retroactively to May 2011.  Breland received LTD benefits until May 16, 2013, when Liberty Life terminated his benefits.  Breland appealed the termination, and Liberty Life denied the appeal in January 2014.

In February 2014, Breland filed the present ERISA lawsuit (Dkt. 1).  As part of its answer, Liberty Life filed a counterclaim against Breland, seeking the return of overpaid LTD benefits pursuant to 29 U.S.C. § 1132(a)(3) (Dkt. 7).  In addition to its counter-motion, Liberty Life has moved for summary judgment on its counterclaim.  Breland's benefits claim and Liberty Life's counterclaim will be analyzed separately below.

### III. ANALYSIS

**A.  Breland's Benefits Claim**

**1.  Standard of Review**

As a preliminary matter, the Court must determine whether the correct standard of review is de novo or "arbitrary and capricious."  Under de novo review, the court reviews the evidence

---

[1] This section provides an overview of the history of the claim at issue.  Doctor reports, functional assessments, and other medical evidence in the administrative record are discussed in greater detail infra, in the analysis of whether the denial of benefits decision should be upheld.

2

afresh, without any deference to the findings made in the administrative process; under the latter

standard, exceptional deference is the rule:

> The arbitrary and capricious standard is "the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 541 (6th Cir. 2003) (quotation marks and citation omitted). The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was "rational." Id. Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious. Williams v. Int'l Paper Co., 227 F.3d 706, 712 (6th Cir. 2000). Yet the deferential standard of review does not mean courts should "rubber stamp[ ]" a plan administrator's decision — a court must review the quantity and quality of the medical evidence on each side. Evans v. UnumProvident Corp., 434 F.3d 866, 876 (6th Cir. 2006). A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from "a deliberate principled reasoning process" and is supported by "substantial evidence." Baker v. United Mine Workers of Am. Health & Ret. Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

Schwalm v. Guardian Life Ins. Co. of Am., 626 F.3d 299, 308 (6th Cir. 2010).

In reviewing a denial of benefits challenged under § 1132(a)(1)(B), a court should apply

a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire

& Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). "[A]pplication of the highly deferential

arbitrary and capricious standard of review is appropriate only when the plan grants the

administrator authority to determine eligibility for benefits or to construe the terms of the plan."

Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996). There appears to be

no dispute that the disability policy at issue in this case gives Liberty Life discretionary authority

to determine eligibility for benefits.[2]   Nevertheless, Breland contends that the grant of authority

is void and unenforceable under Michigan law, which invalidates discretionary clauses in certain

circumstances.

> Michigan's anti-discretionary clause regulation provides, in pertinent part, that:

>> (b) On and after [July 1, 2007], an insurer shall not issue, advertise, or deliver to any person in this state a policy, contract, rider, indorsement, certificate, or similar contract document that contains a discretionary clause. This does not apply to a contract document in use before that date, but does apply to any such document revised in any respect on or after that date.

>> (c) On and after [July 1, 2007], a discretionary clause issued or delivered to any person in this state in a policy, contract, rider, indorsement, certificate, or similar contract document is void and of no effect. This does not apply to contract documents in use before that date, but does apply to any such document revised in any respect on or after that date.

Mich. Admin. Code. R. 500.2202.

Liberty Life does not contest that the policy containing the discretionary clause was

revised after July 1, 2007.  See Def. Reply at 2 n.1.  However, Liberty Life's contends that the

policy was issued and delivered in North Carolina, which the parties agree would make the anti-

discretionary clause regulation inapplicable.[3]   Breland, on the other hand, argues that de novo

review should apply because, according to Michigan's anti-discretionary clause regulation,

Liberty Life "delivered" the long-term disability policy "to a person in the state of Michigan"

when it provided Breland's counsel with a copy of the policy on June 9, 2011.  See Pl. Br. at 17-

18; Pl. Reply at 1.  Breland claims that such delivery was "contemplated by the administrative

_____

[2] The policy states that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." Administrative Record ("A.R.") at LL-0042.

[3] The policy states that it "is delivered in and governed by the laws of [North Carolina] and to the extent applicable by [ERISA] and any subsequent amendments."  A.R. at LL-0001.

4

rules promulgated by the Michigan Office of Financial and Insurance Services." Pl. Resp. at 1. Breland does not provide any authority for this contention, nor has the Court discovered any such authority. And, unfortunately, neither the Michigan Insurance Code nor the Michigan administrative rules define the term "deliver."

However, the term "delivery" has been addressed in the more general insurance context. These definitions confirm that "delivery" of an insurance document is a formal undertaking, reflecting an intent by the insurer to transfer "control" of the document to the insured. See, e.g., 1A Steven Plitt et al., Couch on Ins. 3d § 14:6 n.1 (2014) (defining "delivery" as "the act of the insurer of placing a policy in the control of the insured or someone on his or her behalf or of holding the policy for him or her subject to his or her direction"); 1-3 Robert B. Hille et al., New Appleman on Ins. Law Library Edition § 3.05 (2014) (noting that "delivery of the policy is usually the last act in the contract process" and is generally "accomplished by physical means, but it can also be constructive in the absence of policy provisions to the contrary because delivery is largely a matter of intent"); see also 43 Am. Jur. 2d Ins. § 230 (2015) ("In the absence of an express provision, delivery of an insurance policy does not necessarily mean manual delivery to the insured in person because delivery is complete if the legal essentials of a delivery are present: (1) the insurer's intention to part with control of the instrument and to place it in the possession or control of the insured or some person acting for him or her; and (2) an act providing evidence of this purpose."). These definitions demonstrate that "delivery" requires a degree of formality, typically found in the formation or modification of the insurance relationship, evidencing an intent to transfer control of the document.

Nothing in the language or history of the regulation suggests any reason to depart from the more formal parameters for the meaning of "delivery." And departing from formal

parameters by adopting Breland's reading of the term "delivery" — as simply any transmittal of an insurance document — would mean that any beneficiary or insured could nullify a discretionary clause through the simple expedient of requesting a policy document. If Michigan authorities meant to create such power in the hands of a beneficiary or insured, they certainly would have employed more straightforward language to achieve that end. See, e.g., Mich. Comp. Laws § 500.8103 (defining terms); Mich. Admin. Code. R. 500.2201 (defining terms).

Here, Liberty Life's act of sending a copy of the policy to Breland's counsel in response to his request cannot reasonably be construed as "delivery" of the policy. Neither the request nor the response had anything to do with the formation or modification of the insurance relationship. There was certainly no intent to transfer "control" of any document by virtue of Liberty Life's act of sending a copy of the policy. Its action cannot properly be characterized as a formal act that was intended by the parties to have any legal significance. By contrast, when Liberty Life intended to undertake a formal act of transferring control of the policy — as it did when it issued the insurance policy to Lowe's, as the insured — it did so by expressly making known its intention through the provision that the policy was being delivered in North Carolina.

Accordingly, Liberty Life's action in sending the policy to Breland's counsel did not meet the definition of delivering the insurance policy to a person in the State of Michigan and, thus, Michigan's anti-discretionary clause regulation does not void the policy's discretionary clause. The appropriate standard of review is "arbitrary and capricious."

### 2. Breland's Employment and Disability Background

#### i. Breland's Employment and Claim for Short-Term Disability (STD) Benefits

Breland was employed as a sales specialist in the kitchen department by Lowe's. Compl. ¶ 4 (Dkt. 1). Pursuant to a group disability insurance policy, Liberty Life provides both short-

term and long-term disability insurance to Lowe's employees.  Administrative Record ("A.R.") at LL-0001-0047.

Breland contends that he suffers from lower back pain and, on February 14, 2011, he commenced a disability leave from his employment after sustaining a back injury as a result of a fall during a hunting trip.  Id. at LL-0074, LL-0076-0077.  Breland provided Liberty Life with notice of a claim for STD benefits on February 21, 2011.  Id. at LL-0076-0077.  Given the information provided by Breland's treating physician, Dr. Roy Parke, D.O., regarding Breland's physical condition, id. at LL-1164, and Lowe's description of Breland's job as a medium-to-light duty position, id. at LL-0957-0958, Liberty Life approved the STD benefits claim.  Id. at LL-0068.

### ii.   Breland's Claim for Long-Term Disability (LTD) Benefits

Given the date of his disability, Breland's potential eligibility for LTD benefits became effective May 16, 2011.  Id. at LL-0076.  In order to be eligible for LTD benefits, Breland had to have been unable to perform the material duties of his own occupation during the first 24 months.  Id. at LL-0007.  In order to be eligible for LTD benefits beyond the first 24 months, Breland had to have been unable to perform the material and substantial duties of any occupation.  Id.

On May 10, 2011, Liberty Life denied Breland's claim for LTD benefits.  Id. at LL-0934-0938.  This decision was based on the following: (1) an independent peer-review report completed by Dr. Philip Marion, M.D., who is board certified in physical medicine and rehabilitation, id. at LL-0943-0947, and (2) a vocational report regarding the physical demand of Breland's sales-specialist occupation.  Id. at LL-0942.  However, after Breland pursued an administrative appeal of the denial, and a different independent peer review was conducted,

Liberty Life reversed its administrative determination and approved Breland's LTD claim on January 30, 2012, to be applied retroactively to May 16, 2011. Id. at LL-0633.

### iii.  Liberty Life's Video Surveillance

On May 16 2012, Liberty Life received a report from an investigation firm that had performed 32 hours of surveillance over four days. Id. at LL-0457-0468. Breland is only observed on two of the four days, totaling 100 seconds. Id. at LL-0460-0461. According to the report, on May 7, 2012, Breland was observed entering and exiting a post office on two occasions. Id. at LL-0462-0463. The report states that Breland "appeared to ambulate in a normal manner without restrictions or the use of visible medical devices." Id. at LL-0460-0461. On May 8, 2012, Breland was observed "manually lifting the garage door utilizing his right arm, entering the garage and walking out of view. Id. at LL-0461. Again, the report states that Breland "appeared to ambulate in a normal manner, without restrictions or the use of any visible medical devices." Id.

On December 14, 2012, Liberty Life received another report for 24 hours of video surveillance performed over three days. Id. LL-0299-0307. Breland was observed on two of the three days, totaling 27 seconds. Id. 301. According to the report, on December 6, 2012, Breland was observed exiting his "residence, walk[ing] towards the garage and retriev[ing] some tools." Id. at LL-0303. Breland was observed later in the day exiting his residence, retrieving the newspaper, standing next to his garage, closing the garage door, and walking towards his residence. Id. The report states that, on both occasions, Breland "appeared to ambulate in a normal manner, without restrictions or the use of any visible medical devices." Id. Then, on December 7, 2012, Breland was observed exiting his residence, walking towards his garage door, closing his garage door, and walking back toward his residence. Id. at LL-0304. Breland was

also later observed standing next to a shed, and then walking toward his residence.  <u>Id.</u> at LL-0305.   Again, the report indicated that Breland "appeared to ambulate in a normal manner, without restrictions or the use of any visible medical devices."  <u>Id.</u> at LL-0304-0305.

### iv.  Medical Reports

#### a.  Spinal MRIs

In April 2009, magnetic resonance imaging ("MRI") was performed on Breland's lumbar spine.  <u>Id.</u> at LL-0828.  Breland presented with a clinical indication of stenosis and degenerative disc disease.  <u>Id.</u>  According to the report, the MRI showed "subarticular recess stenosis and moderate right foraminal stenosis" at L3-4, and "moderate-to-severe bilateral foraminal stenosis and mild bilateral subarticular recess stenosis" at L4-5.  <u>Id.</u>  The MRI also showed "moderate-to severe left foraminal stenosis plus mild left subarticular recess stenosis" at L5-S1.  <u>Id.</u>

In February 2011, Breland's treating physician, Dr. Parke, obtained another MRI of Breland's lumbar spine, which revealed "a small to moderate central and left paracentral disk protrusion, mildly narrowing the left lateral recess," as well as "moderate bilateral forminal stenosis" at L3-4.  <u>Id.</u> at LL-0741.  At L4-5, the MRI showed "a small to moderate central and left paracentral disk protrusion" with "narrowing of bilateral lateral recess," as well as "moderate bilateral frontal stenosis."  <u>Id.</u>  And at L5-S1, the MRI showed "a small central disk protrusion, mildly narrowing bilateral lateral recesses," as well as "moderate bilateral frontal stenosis."  <u>Id.</u> at LL-0741-0742.  This MRI was compared to one performed in 2007, and the report of the MRI indicated "[m]ultilevel changes of spondylotic degenerative disk disease" that had "generally progressed" since the 2007 MRI.  <u>Id.</u> at LL-0742.

In November 2013, a MRI was performed on Breland's cervical spine.  <u>Id.</u> at LL-0116.   The radiologist's interpretation of the MRI images indicated "loss of disc height with

9

predominantly bilateral, lateral protruding disc and corresponding endplate osteophyte from C4-5 through C6-7." Id.  The radiologist also indicated that, at C4-5, "there is severe right and moderate left forminal stenosis," as well as "mild spinal stenosis and severe bilateral foraminal stenosis" at C5-6.  Id.  Finally, at C6-7, the radiologist noted "mild spinal stenosis, severe left and moderate right forminal stenosis."  Id.  Breland was diagnosed with cervical degenerative disc disease, cervical radiculopathy, cervical stenosis, and cervical spondylosis without myelopathy.  Id.

### b.  Dr. Roy Parke, D.O. — Treating Physician

Dr. Roy Parke, D.O., a board-certified physician in family practice, is Breland's treating physician.  Pl. Br. at 2; A.R. at LL-0150.  According to the medical records, Breland visited Derek Henderson, Dr. Parke's physician assistant, at the Buchanan Family Medical Center on January 11, 2012.  A.R. at LL-0583.  Henderson noted that Breland has a "history of chronic low back pain," and that Breland experiences "essentially constant pain."  Id.

On March 1, 2012, Dr. Parke provided Liberty Life with a restrictions form, which included a diagnosis of degenerative disc disease, as well as a list of the following restrictions and limitations:

- unable to sit more than 15 minutes;

- unable to lift more than 5 pounds;

- unable to stand more than 10 minutes;

- unable to walk more than 15 minutes or more than 100 feet.

Id. at LL-0580.  Dr. Parke also wrote that Breland "will likely not be able to return to work."  Id.

Breland was seen again by Henderson on November 16, 2012.  Id. at LL-0318.  Henderson noted that Breland was "evaluated for low back pain," and that "[h]is symptoms are

10

worse since last visit." Id.  Breland then saw Susan Smith, another one of Dr. Parke's physician assistants, on February 12, 2013.  Id. at LL-0159.  Smith's notes are essentially the same as Henderson's notes.  Id. (that Breland presented with lower back pain, his symptoms are worse since his last visit, and the pain is most prominent in his lumbar spine).

On March 4, 2013, Dr. Parke provided Liberty Life with another restrictions form indicating the same diagnosis and list of restrictions as the March 2012 form.  See id. at LL-0248.  Again, Dr. Parke wrote that Breland "will likely not be able to return to work."  Id.

In response to Liberty Life's request, Dr. Parke also provided Liberty Life with updated medical records, as well as other documents, including a letter dated February 28, 2013 (but signed March 6, 2013), in which Dr. Parke stated that he did not believe Breland had a full-time sedentary work capacity, id. at LL-0239, and a letter dated March 4, 2013 (but signed March 12, 2013), in which Dr. Parke agreed with the restrictions offered by Dr. Mark Kaplan, one of Liberty Life's file reviewers, suggesting that Breland was capable of sedentary work.  Id. at LL-0246.  Dr. Parke has sought to clarify any apparent confusion between these two letters, claiming that "[i]t is and has always been [his] opinion that Mr. Breland is not capable of performing with reasonable continuity the Material and Substantial duties of any occupation.  The form [he] signed to the contrary was an error and should not be relied upon."  Id. at LL-0151.

### c.  Liberty Life's File Reviews

#### 1.  Dr. David Peterson, M.D. — April 2012

On April 12, 2012, Dr. David Peterson, M.D., prepared a report for Liberty Life based on his review of Breland's medical records.  A.R. at LL-0539-0545 (report); id. at LL-0533-0534 (addendum report).  Although "the medical records support impairment for this claimant due to chronic pain syndrome," according to Dr. Peterson, the 2011 lumbar "MRI does not show nerve

11

compression or any proof of a pain generator that would support total impairment and inability to work at any level." Id. at LL-0533; see also id. LL-0540 (noting that the February 2011 lumbar spine MRI "showed a small to moderate disk protrusion at L3/L4 with moderate bilateral foraminal stenosis, but no nerve root compression", as well as "a similar disk protrusion at L4/L5 without nerve root compression"). As such, it was Dr. Peterson's opinion that Breland was capable of either "part-time or possibly full-time work" with certain restrictions and limitations consistent with a light-duty work capacity. Id. at LL-0540. Dr. Peterson identified the following physical restrictions and limitations:

- Lift and carry up to 20 pounds occasionally and 10 pounds frequently;

- No indication that would prevent working above shoulder level for 15 to 30 minutes;

- Claimant can bend and stoop occasionally but not on any persistent repetitive basis.

Id. After noting a lack of consensus between Breland's treating physicians and himself, Dr. Peterson suggested that the use of video surveillance may confirm Breland's complaints. Id. at LL-0533-0534.

### 2. Dr. Mark Kaplan, M.D., and Dr. Lev Basin, M.D. — July 2012

On July 2, 2012, an independent peer-review report was prepared by Dr. Mark Kaplan, M.D., a board-certified physician in physical medicine and rehabilitation, and Dr. Lev Basin, M.D., a board-certified psychiatrist. Id. at LL-0433-0449. Each reviewer considered Breland's medical records, as well as the May 2012 video surveillance and accompanying report. Id. LL-0434-0436 (Basin), LL-0440-0447 (Kaplan).

In Dr. Basin's opinion, "[t]here are several pieces of evidence in the medical file [that Breland] has been complaining of symptoms of depression and anxiety."   Id. at LL-0437. However, Dr. Basin concluded that, from a psychiatric standpoint, there was "no support of impairments severe enough that would translate to any restrictions or limitations."   Id.   In addition, Dr. Basin attempted to contact Dr. Parke on three different occasions to discuss Breland's case, but he never received a call back.   Id. at LL-0436.

Dr. Kaplan agreed that Breland's supported diagnoses included "chronic cervical and lumbar spondylosis with cervical and lumbar radiculopathy."   Id. at LL-0447.   Based on his review, Dr. Kaplan imposed the following physical restrictions and limitations:

- Restrict lifting to 10 pounds occasionally;

- Restrict in total overhead lifting;

- Restrict standing to one hour in an eight-hour day, 20 minutes occasionally;

- Restrict walking to one hour in an eight-hour day, 20 minutes occasionally;

- Allow position changes when sitting;

- Restrict reaching below waist level to occasional; and

- Restrict bending to occasional.

Id. at LL-0448.  Dr. Kaplan was able to speak with Dr. Parke and, based on that conversation, noted that Breland was "able to mow the grass and he and his wife tend to animals."   Id. at LL-0447.  According to Dr. Kaplan, Dr. Parke "couldn't say that the claimant wouldn't be able to perform a sedentary job."   Id.

### 3.  Dr. Mark Hinrichs, M.D. — March 2013

On March 26, 2013, Dr. Mark Hinrichs, M.D., a board-certified physician in physical medicine and rehabilitation, prepared a peer-review report.  Id. at LL-0213-0227.  Dr. Hinrichs considered Breland's medical records, as well as the December 2012 video surveillance.  Id. at LL-0213-0217.  Dr. Hinrichs also spoke with Dr. Parke's physician assistant, Ms. Smith, who "noted the claimant was unable to sit for any length of time greater than 15 minutes or stand for greater than 15 minutes, or walker greater than 15 minutes at a time and felt that based on what they had observed in the office, there had been no improvement."  Id. at LL-0218.  According to Dr. Hinrichs, Smith did not know that a surveillance video had been performed.  Id.

Dr. Hinrichs recognized that Breland "has a history of chronic low back pain and has documented degenerative disc disease, facet joint hypertrophy with broad-based disc protrusion, and some lateral recess stenosis."  Id.  Nevertheless, Dr. Hinrichs did "not believe the medical record as documented supports that the claimant is unable to return to work at a sedentary level."  Id.  Based on the medical records, Dr. Hinrichs found that Breland could "return to work in a light capacity" with the following physical restrictions and limitations:

- Lifting no greater than 20 pounds occasionally and 10 pounds frequently;

- No lifting above shoulder level;

- No pushing or pulling greater than 50 pounds occasionally or 25 pounds frequently;

- No medical documentation to support sitting, standing, or walking restrictions.

Id.

### 4. Gregory Sheets, nurse case manager — November 2013

14

On November 7, 2013, Liberty Life's disability case manager requested a nurse case manager in its managed care department to review the record's in Breland's file. Id. at LL-0050. Six days later, on November 13, Gregory Sheets, a nurse case manager, prepared a claim note summarizing his review of Breland's medical records, which included the records Breland submitted in support of his appeal. Id. at LL-0049-0050. In Sheets's opinion, there was no evidence supporting restrictions beyond the scope of those previously identified, nor was there any evidence of worsening or deterioration of Breland's condition since completion of the prior peer review. Id. at LL-0050.

After Sheets had completed his file review, Breland's file was referred to Liberty Life's appeals review unit. Id. at LL-0049. On December 4, 2013, the assigned appeal review consultant requested an additional peer review by an independent physician who was board certified in pain management and rehabilitation medicine. Id.

### 5. Dr. Philippe Chemlay, Jr., D.O. — January 2014

On January 17, 2014, Dr. Philippe Chemlay, Jr., D.O., a board-certified physician in physical medicine and rehabilitation medicine and a board-certified independent medical examiner, prepared a peer-review report based on his extensive review of Breland's medical records and supporting documentation. Id. at LL-0094-0106. Upon review of Breland's medical records, Dr. Chemlay found that the following diagnoses were medically supported: chronic neck and low back pain, chronic cervical and lumbar spondylosis, cervical and lumbar radiculopathy, lumbar facet arthropathy, bilateral shoulder impingement and right shoulder rotator cuff subacromial decompression. Id. at LL-0104. However, Dr. Chemlay noted that the 2011 MRI of the lumbar spine did not show "nerve compression or any proof of a pain generator that would support total impairment and inability to work at any level." Id. at LL-0102.

15

Dr. Chemlay also spoke with Dr. Parke, but noted that they were unable "to reach consensus in regard to [Breland's] capacity for sedentary functionality." Id. at LL-0105. According to Dr. Chemlay, Dr. Parke "stated that he felt that Mr. Breland would not be competitively employable in the current job market even in a sedentary position and stated that he was unsure if Mr. Breland would be able to work even part-time, again with no opinion in regard to neurological deficits based on the fact that he could not recall Mr. Breland's most recent examination findings." Id. at LL-0106. Dr. Parke did confirm that Breland visited the office "independently on his own and was able to drive home." Id.

In Dr. Chemlay's opinion, as of May 15, 2013, "the medical file supports functionality in a sedentary setting" with the following physical restrictions and limitations:

- Allowing for symptom-relieving position break every hour from a seated or standing position or walking position for five to 10 minutes;

- Sitting up to six hours in an eight-hour day

- Walking and standing up to two hours in an eight-hour day but not consecutive with allowance for position break every half hour for five to 10 minutes, from a standing or walking position with stair-climbing limited to occasionally;

- Reaching below waist and above shoulder limited to occasionally;

- Unrestricted regarding the area between waist and shoulder;

- Bending, squatting, stooping, and kneeling limited to occasionally;

- Lifting, carrying, pushing, and pulling limited to 10 pounds occasionally with no repetitive activities, including lifting, pushing, or pulling, and no overhead lifting over the shoulders or overhead lifting.

Id. at LL-0104-0105.

16

### v.  Liberty Life's Transferrable Skills Analysis / Vocational Review

On August 16, 2012, Ellen Levine, one of Liberty Life's vocational case managers, provided Liberty Life with an occupational analysis report. Id. at LL-0401-0404. Levine listed Dr. Kaplan's suggested physical restrictions and limitations, and noted that Dr. Basin did not suggest any restrictions or limitations based on her psychiatric file review. Id. at LL-0402. Levine then provided Breland's educational background, as well as his prior work experience. Id. Levine did note that, "based on the physical capacities outlined above, Mr. Breland would need to procure a position that would allow for position changes when sitting." Id. at LL-0403. Based on these assessments, Levine identified five alternative occupations that she felt Breland "was qualified [for] based on his training, education, experience and are within the physical capacities for work outline above," which included: (i) customer service representative; (ii) telephonic order clerk; (iii); drafter/designer; (iv) inside sales representative; and (v) information clerk. Id.

### vi.  Liberty Life's Termination of Breland's Benefits

On May 6, 2013, Liberty Life informed Breland that, effective May 16, 2013, it was discontinuing his LTD benefits, as this was the date that "disability" changed from "own occupation" to "any occupation" based on the disability policy. Id. at LL-0204-0207. The termination letter indicated that Liberty Life had received medical records from Dr. Parke through February 12, 2013, as well as Dr. Parke's March 12, 2013 letter, in which he agreed with certain physical restrictions and limitations. Id. at LL-0204. The termination letter then provided a summary of Dr. Hinrichs's peer-review report, as well as a summary of Levine's transferable skills analysis report, which noted the sedentary occupations that Breland could

perform based on the physical restrictions associated with Breland's back condition.  Id. at LL-0205.

### vii.   Breland's Appeal and Liberty Life's Denial of Appeal

On October 31, 2013, Breland appealed Liberty Life's decision to discontinue Breland's LTD benefits.  Id. at LL-0141-0146.  In support of his appeal, Breland submitted additional medical records, his own statement of his condition, as well as a statement from Dr. Parke regarding Breland's inability to perform the duties of any occupation.  Id. at LL-0148-0151. According to Breland, he "experience[s] severe back pain on a daily basis" and is "unable to sit for more than ½ hour, lift more than 10 pounds, walk or stand more than 15 minutes, bend, or twist."  Id. at LL-0148.  And, according to Dr. Parke's statement, Breland "has functional limitations related to sitting for extended periods, lifting more than 10 pounds, walking, standing, climbing, bending, twisting, balancing, reaching, or lifting."  Id. at LL-0151.

After receiving Dr. Chemlay's peer-review report, Liberty Life informed Breland, by letter, on January 20, 2014 that it was upholding its prior administrative determination and discontinuing Breland's LTD benefits.  Id. at LL-0084-0093.  The letter summarized the findings of Drs. Basin, Kaplan, Hinrichs, and Chemlay.  Id. at LL-0085-0092.  The letter also stated that Liberty Life considered the Social Security Administration's (SSA) ruling, in which Breland was approved for social security benefits.  Id. at LL-0092.

### 3.   Application of Legal Standard — Reasonable Explanation for Administrative Decision to Deny Benefits

As discussed above, the Court has determined that the deferential arbitrary and capricious review applies to this case.  Thus, the Court must uphold the denial of benefits decision if there is a reasonable explanation for the decision in light of the disability policy's provisions.  Liberty Life argues that its decision was reasonably based on the independent file reviews of Drs.

18

Peterson, Kaplan, Basin, Hinrichs, and Chemlay.  Def. Br. at 18-19.  The Court concludes that Liberty Life is correct, and that a reasonable explanation for its denial of Breland's LTD benefits exists — namely, that the evidence in the record does not indicate that Breland lacked the functional capacity to perform sedentary work with various limitations.

A denial of benefits is upheld under arbitrary and capricious review if there is a rational basis for the decision.  See Morris v. Am. Elec. Power Long-Term Disability Plan, 399 F. App'x 978, 984 (6th Cir. 2010) ("Surely it is reasonable to require a plan administrator who determines that a participant meets the definition of 'disabled,' then reverses course and declares that same participant 'not disabled' to have a reason for the change; to do otherwise would be the very definition of 'arbitrary and capricious.'" (emphasis in original).  In other words, Liberty Life must have "had a rational basis for concluding that [Breland] was not disabled at the time of the new decision."  Id. (emphasis in original).  The rational basis could be premised on "any number of factors [including] evidence of improvement . . . evidence better defining the participant's medical condition, or . . . newly-acquired skills that would permit the previously disabled participant to perform an occupation he had not been qualified for at the time of his disability." Id.

The Court first turns to the disability policy's provisions regarding disability.  To meet the requirements for total disability within the first 24 months of disability, Breland's condition must prevent him from performing the material and substantial duties of his "own occupation."[4] A.R. at LL-0007.  After 24 months, Breland is considered disabled if his condition prevents him from performing, with reasonable continuity, the material and substantial duties of "any

---

[4] The disability policy defines "own occupation" as "the Covered Person's occupation that he was performing when his Disability or Partial Disability began.  For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy."  A.R. at LL-0009.

occupation."[5]  Id.

In light of the foregoing, the Court concludes that Liberty Life had a rational basis for terminating Breland's benefits.  It is true that the medical record establishes that Breland had underlying conditions of lower back pain, as supported by MRIs indicating degenerative disc disease and disc protrusion.  However, Breland had the burden of demonstrating not just an underlying condition, but that the condition resulted in objectively supported functional limitations that prevented him from performing work within the scope of the disability policy.  Liberty Life's conclusion that Breland was capable of doing sedentary work with certain limitations was rational and supported by medical opinions.

In particular, Liberty Life's decision to deny LTD benefits is supported by five independent peer-review doctors' reports.  First, Dr. Peterson reviewed the medical records provided by Dr. Parke, including the 2011 lumbar spine MRI, which, in his opinion, did "not show nerve compression or any proof of a pain generator that would support total impairment and inability to work at any level."  Id. at LL-0533.  As such, Dr. Peterson believed that "[t]he medical records support [Breland's] ability to sustain at least part-time or possible full-time work" with certain restrictions and limitations.  Id. at LL-0540.  Second, Dr. Basin found that, from a psychiatric standpoint, there was "no support of impairments severe enough that would translate to any restrictions or limitations."  Id.  Third, while Dr. Kaplan concluded that the medical documentation supported Breland's diagnoses, he imposed a number of restrictions and limitations (e.g., restrict lifting to 10 pounds occasionally; restrict in total overhead lifting; restrict standing to one hour in an eight-hour day, 20 minutes occasionally; restrict walking to one hour in an eight-hour day, 20 minutes occasionally; allow position changes when sitting;

---

[5] The disability policy defines "any occupation" as "any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity."  Id. at LL-0006.

restrict reaching below waist level to occasional; and, restrict bending to occasional) that would accommodate those diagnoses.  Id. at LL-0448.  Fourth, Dr. Hinrichs concluded that, although Breland "has a history of chronic low back pain and has documented degenerative disc disease, facet joint hypertrophy with broad-based disc protrusion, and some lateral recess stenosis," Dr. Hinrichs did "not believe the medical record as documented supports that the claimant is unable to return to work at a sedentary level."  Id. at LL-0218.  Based on the medical records, Dr. Hinrichs found that Breland could "return to work in a light capacity" with certain physical restrictions and limitations.  Id.  Fifth, like Dr. Peterson, Dr. Chemlay also found that the 2011 MRI of the lumbar spine did not show "nerve compression or any proof of a pain generator that would support total impairment and inability to work at any level."  Id. at LL-0102.  As such, Dr. Chemlay concluded that "the medical file supports functionality in a sedentary setting" with certain physical restrictions and limitations.  Id. at LL-0104-0105.

Liberty Life's decision is further supported by video surveillance performed in May 2012, which, according to the surveillance report, showed Breland manually lifting a garage door with his right arm, id. at LL-0461, an action that is at odds with both Dr. Parke's and Breland's described limitations.  Because it is entirely rational for Liberty Life's to rely on five peer-review reports, as well as the video surveillance in this case, the Court concludes that Liberty Life's decision to deny Breland LTD benefits was not arbitrary and capricious.

### 4.  Plaintiff's Arguments

Breland presents several arguments to support the proposition that Liberty Life wrongfully terminated his LTD benefits.  The Court addresses each of these arguments in turn.

### i. Weight Given to File Reviews, as Opposed to the Treating Physician's Opinion

Breland argues that the independent reviewers' credibility is at issue because they reached a different result than Breland's treating physician and because they did not physically examine Breland.  Pl. Br. at 20.  Breland contends that the independent reviewers "completely discount the objective medical testing that revealed permanent damage."  Id. at 21.  According to Breland, "little weight" should be given to the peer reviewers' opinions, given their conclusory assertions, as opposed to the opinion of the physician who physically examined Breland.  See id. at 23.  Breland argues that Dr. Parke's opinion should "be refuted by another physician who actually examines [Breland], rather than basing his/her findings simply upon a records review."  Id. at 24.  Specifically, Breland contends that, "ordinarily[,] the opinions of treating physicians who have actually examined plaintiff will outweigh the opinion to the contrary of physicians who have merely performed a one-time '[independent medical examination]' or undertaken a 'cold' review of the medical file."  Id. at 25.

First, it is a "well-settled principle that a treating physician's opinion is not entitled to any special deference under ERISA."  Neaton v. Hartford Life & Acc. Ins. Co., 517 F. App'x 475, 483 (6th Cir. 2013) (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822 (2003)).  Second, as the Sixth Circuit has previously noted, "there is nothing inherently improper with relying on a file review, even one that disagrees with the conclusions of a treating physician."  Calvert, 409 F.3d at 297 n.6.  Thus, Liberty Life's "decision to conduct a file review rather than a physical exam [is] just one more factor to consider in [the Court's] overall assessment of whether [Liberty Life] acted in an arbitrary and capricious fashion."  Id. at 295.

"[A] plan administrator may not arbitrarily disregard the medical evidence proffered by the claimant, including the opinions of her treating physician."  Calvert, 409 F.3d at 294 (citing Black & Decker, 538 U.S. at 834)).  Rather, "[t]he plan administrator must 'give reasons' for

rejecting a treating physician's conclusions, and those reasons must be consistent with the terms of the plan and supported by the record." Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program, 763 F.3d 598, 608-609 (6th Cir. 2014) (concluding that the defendant's denial of the plaintiff's claim was arbitrary and capricious, where the defendant relied on a doctor's report, which was "inadequate in critical respects").

The Court finds that there is nothing to suggest that Liberty Life or its file reviewers disregarded any of the medical evidence provided by Breland. And the independent peer reviews that Liberty Life relied upon in making its determination adequately explain why they disagreed with the opinion of Breland's treating physician. Notably, Drs. Kaplan and Chemlay reviewed the May 2012 video surveillance in which Breland is observed lifting a garage door with his right arm. And, more importantly, Drs. Peterson and Chemlay noted that the 2011 lumbar spine MRI did not show any nerve compression or any other pain generator that would account for complete disability.

Breland further argues that Dr. Hinrichs's opinion should be discredited because it states that he viewed the video surveillance, but then conversely states that the video was not provided. Pl. Br. at 7. Upon further examination of the report, the Court does not agree with Breland's characterization of Dr. Hinrichs's report.

Dr. Hinrichs's report states that he "personally viewed the surveillance video taken December 6, 2012 and December 7, 2012 in which the claimant is seen to be ambulating without assistive devices, closing doors, carrying tools, etc." A.R. at LL-0217; see also id. at LL-0219 (noting his review of the December 2012 surveillance report, and that it was "considered in the opinions above"). However, Dr. Hinrichs's report also states that "a surveillance report . . . was noted but not included in the medical record. I am happy to review that if it is provided." Id. at

LL-0213; see also id. at LL-0219 ("Please note a surveillance video was noted, but a report or video has not been sent to me."). As noted earlier in this opinion, video surveillance was conducted in May and December 2012. Given the ambiguity in his report, it is entirely possible that Dr. Hinrichs viewed the December 2012 surveillance but not the May 2012 surveillance; his statement that he would be happy to review a surveillance report could relate to the May 2012 surveillance. Without anything further to suggest that Dr. Hinrichs did not view the December 2012 surveillance, the Court neither discredits Dr. Hinrichs's report on this point nor finds that Liberty Life's reliance on Dr. Hinrichs's opinion was arbitrary and capricious.

### ii. Social Security Award

Breland's claim for social security disability benefits was approved on June 6, 2012. A.R. at LL-0416. Liberty Life argues that it accounted for the favorable social security award in making its determination to discontinue Breland's LTD benefits. Def. Br. at 20 (citing A.R. at LL-0092). And, according to Liberty Life, a plan administrator does not have to refute the reasoning or analysis of an ALJ regarding a social security award. Id. at 21. Nevertheless, Liberty Life claims that the ALJ's factual findings are consistent with a sedentary work capacity. Id. at 22 (citing A.R. at LL-0429).

"The SSA determination to award benefits to [Breland] is . . . just one factor the Court should consider, in the context of the record as a whole, in determining whether [Liberty Life's] contrary decision was arbitrary and capricious." Calvert, 409 F.3d at 295. "[F]ailure to consider an SSA award is relevant to the question of whether the plan's denial of disability retirement benefits was arbitrary and capricious. It is not necessary, however, that the plan administrator expressly distinguish a favorable SSA determination in denying disability benefits under the plan." Leffew v. Ford Motor Co., 258 F. App'x 772, 779 (6th Cir. 2007).

In upholding its administrative decision to deny Breland's LTD benefits, Liberty Life expressly acknowledged that it considered the SSA's ruling to approve social security benefits. A.R. at LL-0092.  Liberty Life further claimed to have reviewed medical records that were not considered by the SSA in its determination process.  Id.  Accordingly, Liberty Life properly considered Breland's social security award when making a decision regarding the continuation of LTD benefits.

### iii.  Staleness of Vocational Review

Breland argues that Levine's vocational review is "stale" because it was completed in August 2012, but Liberty Life did not deny Breland's LTD benefits until May 2013.  Pl. Resp. at 12 (Dkt. 20).  Breland notes that the vocational review was based on restrictions and limitations found in Dr. Kaplan's report, but that Liberty Life upheld its denial determination based on Dr. Chemlay's report, who identified different restrictions and limitations than Dr. Kaplan.  Id. at 12-13.  In its reply, Liberty Life argues that Dr. Kaplan's restrictions and limitations "are almost identical to those identified in Dr. Chemlay's report."  Def. Reply at 5 (Dkt. 23).  The Court agrees with Liberty Life.  Because the restrictions and limitations identified by Dr. Kaplan and Dr. Chemlay are sufficiently similar, Liberty Life did not act in an arbitrary and capricious manner by relying on Levine's vocational review in denying Breland's LTD benefits or by not conducting a second vocational review.

### iv.  Conflict of Interest

Breland argues that Liberty Life was operating under an inherent conflict of interest, as both payor of benefits and the party determining benefits eligibility.  Pl. Resp. at 5-6.  Because Liberty Life both determines eligibility for benefits under an ERISA plan and also pays those benefits, an inherent conflict of interest exists.  See Schwalm, 626 F.3d at 311.  A court is to

consider a conflict of interest as one factor among several in evaluating a plan administrator's decision to deny benefits. <u>Metro Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 117 (2008).  However, "this conflict of interest does not displace the arbitrary and capricious standard of review; rather, it is a factor that we consider when determining whether the administrator's decision to deny benefits was arbitrary and capricious." <u>Hunter v. Life Ins. of N. Am.</u>, 437 F. App'x 372, 376 (6th Cir. 2011).  A court should look to see "if there is evidence that the conflict in any way influenced the plan administrator's decision." <u>Id.</u> (citing <u>Carr v. Reliance Standard Life Ins. Co.</u>, 363 F.3d 604, 606 n.2 (6th Cir. 2004).

The Court has carefully reviewed the record, and concludes that Breland has not pointed to any evidence that a conflict of interest affected the benefits decision. Specifically, Breland has pointed to no evidence that Liberty Life's reliance on the opinions of independent peer reviewers over the treating physician was driven by a conflict of interest.  <u>See</u>, <u>e.g.</u>, <u>Kalish v. Liberty Mut./Liberty Life Assurance Co. of Boston</u>, 419 F.3d 501, 507-508 (6th Cir. 2005) (concluding that, although a plan administrator operates under a conflict of interest "in choosing independent experts who are paid to assess a claim," the defendant did not acted arbitrarily and capriciously in crediting the opinion of the reviewing physician over that of the treating physician where the plaintiff "offered only conclusory allegations of bias" and "failed to present any statistical evidence to suggest . . . [the reviewer] has consistently opined that claimants are not disabled."). Without such evidence, Liberty Life's decision cannot be deemed arbitrary and capricious on the basis of a conflict.

Accordingly, the Court concludes that Liberty Life's termination of Breland's benefits was not arbitrary and capricious.  Under the arbitrary and capricious standard, there is sufficient record evidence to provide a rational basis for Liberty Life's termination of the benefits.

26

Because there is a reasonable explanation for the denial of benefits, the Court is bound to uphold Liberty Life's decision.

**B.  Liberty Life's Counterclaim**

Liberty Life argues that the disability policy allows Liberty Life to reduce a covered person's disability benefits by the amount of "other income" that Liberty Life estimates is payable to the covered person.  Def. Br. at 22.  Liberty Life states that it approved Breland for LTD benefits and began paying monthly benefits to Breland effective May 16, 2011.  Id.  Liberty Life further states that on February 10, 2012, Breland executed a Social Security Reimbursement Agreement, electing the option under which Liberty Life would not reduce his monthly benefits until Breland's social security benefits application was decided.  Id. (citing A.R. at LL-0613). The election provided for Breland to reimburse Liberty Life for any overpayment in the event that social security benefits were subsequently awarded.  Id.

On August 7, 2012, the SSA notified Breland that he was being awarded social security benefits.  Id. at 23 (citing A.R. at LL-0369).  Breland received a lump-sum payment for benefits for the period through July 2012, and began receiving monthly benefits in the amount of $1,229. Id.  Liberty Life claims that the lump-sum payment and the monthly SSA benefits resulted in an overpayment totaling $16,591.50.  Id. (citing A.R. at LL-0308-0309).  Therefore, as of May 15, 2013 (when Breland's benefits were discontinued), Liberty Life purports that Breland's outstanding repayment obligation was $14,393.90.  Id. (citing A.R. at LL-0202).

Breland agrees that the LTD plan mandates that the receipt of social security benefits will reduce his monthly LTD benefits.  Pl. Resp. at 15.  Breland further agrees that the plan is entitled to recoup any overpayment that might have occurred.  Id.  Nevertheless, Breland contends that he is still disabled and entitled to monthly LTD benefits despite the social security disability

setoff.  Id. at 16.  According to Breland, "[w]hen these payments are taken into account, the SSD

overpayment is significantly reduced."  Id. at 16.  Breland requests that the Court require Liberty

Life "to offset any alleged overpayment by the past due benefits owed and provide an accurate

accounting of any remaining balance."  Id.

Pursuant to 29 U.S.C. § 1132(a)(3),

> [a] civil action may be brought by a . . . fiduciary (A) to enjoin any
> act or practice which violates any provision of this subchapter or
> the terms of the plan, or (B) to obtain other appropriate equitable
> relief (i) to redress such violations or (ii) to enforce any provisions
> of this subchapter or the terms of the plan.

The Supreme Court has held that a fiduciary's action to enforce a third-party reimbursement

provision "qualifies as an equitable remedy because it is indistinguishable from an action to

enforce an equitable lien established by agreement."  Sereboff v. Mid Atl. Med. Servs., Inc., 547

U.S. 356, 368 (2006).  And the Second Circuit has held that a defendant presents a claim for

"appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) where the defendant sought the

return of overpaid benefits.  Thurber v. Aetna Life Ins. Co., 712 F.3d 654, 666 (2d Cir. 2013).

The Court has already determined that Liberty Life's denial of benefits was not arbitrary

and capricious.  Consequently, Breland's argument that the amount Liberty Life is entitled to

recoup should be reduced by past-due LTD payments is unavailing.  Because there is no genuine

issue of material fact that Breland was awarded SSA disability benefits, and that Liberty Life's

disability policy requires the return of overpaid benefits, the Court concludes that Liberty Life is

entitled to summary judgment regarding its counterclaim.

## V. CONCLUSION

For the reasons stated above, the Court grants Defendant's motion for judgment and

summary judgment on its counterclaim (Dkt. 16), and denies Plaintiff's motion for judgment

(Dkt. 17).  The Court further orders Breland to repay to Liberty Life the amount of overpaid benefits, totaling $14,393.90.  Liberty Life, as the prevailing party, shall submit to the Court a proposed judgment in accordance with this opinion and order within seven days.

      SO ORDERED.


Dated:  March 12, 2015          s/Mark A. Goldsmith          
      Detroit, Michigan        MARK A. GOLDSMITH
                               United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 12, 2015.

                         s/Carrie Haddon          
                         Case Manager